UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**TRENT P. FISHER ENTERPRISES, LLC, et al.,**

    *Plaintiffs*,

v.

**SAS AUTOMATION, LLC, et al.,**

    *Defendants*.

Case No. 3:20-cv-216
Judge Thomas M. Rose

---

**ENTRY AND ORDER GRANTING MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM BY DEFENDANT. (ECF 10).**

---

Pending before the Court is a Motion to Dismiss for Failure to State a Claim by Defendants SAS Automation, Piab USA, Inc., and Piab AB. (ECF 10). Defendants ask the Court to dismiss portions of the Complaint filed by Plaintiffs Trent P. Fisher Enterprises, LLC and The Fisher Family Dynasty Trust Dated July 19, 2007. In 2017, Trent Fisher sold SAS Automation to Piab USA. Now, through Fisher Enterprises and the Fisher Family Trust, both of which he controls, Fisher is suing SAS Automation; Piab USA; and a Swedish affiliate, Piab AB. Plaintiffs' claims allegedly arise out of two intellectual property-related agreements that Fisher executed—on behalf of both SAS Automation and Plaintiffs—in connection with the sale of SAS Automation. The Complaint alleges breach of contract, copyright infringement, trade secret misappropriation, and common-law conversion. Plaintiffs have responded to the motion, (ECF 19), Defendants have replied, (ECF 21), rendering the motion ripe for decision.

I.      Background

This action contests the conduct of Defendants over the course of nearly three years since the sale of those equity units in SAS Automation ("SAS"), a manufacturer of robotic equipment based in Xenia, Ohio, to Piab USA pursuant to an Equity Agreement. (Doc. 1, PageID 2–3, ¶¶1, 11). Trent Fisher is the former owner of SAS. (Id., ¶¶ 9, 11.) In 2017, Fisher sold the company to Piab USA pursuant to an Equity Interest Purchase Agreement (the "Equity Agreement"). (Id., ¶¶ 9, 36– 39.) Piab USA is a wholly owned subsidiary of Piab AB, a Swedish automation and robotics company. (Id., ¶¶ 12, 13.)

At the same time, Fisher and SAS executed an "Intellectual Property Assignment Agreement" (the "IP Assignment Agreement"). (Doc. 1, ¶¶ 40–45; see also Doc. 1-1.) The parties to the IP Assignment Agreement were: Fisher, in his individual capacity; the Fisher Family Trust; and SAS. (Doc. 1-1 at PageID 43.) Fisher was still President of SAS at the time of this agreement, and he executed it on behalf of all three parties. (Id. at 9.) In the IP agreement, SAS assigned to the Fisher Family Trust its ownership of and rights in intellectual property assets listed in Exhibit A to the agreement:

>       the "Software for the 'MySAS application'";
>
>       the "CAD Download Software"; and
>
>       "all Intellectual Property exclusively related thereto," excluding certain trademarks.

(Doc. 1-1 at PageID 43–44, 51.)

The mySAS mobile phone app (the "my SAS App") had been released by SAS in 2016 for iOS and Android mobile operating systems for use by SAS customers. (Doc. 1, ¶¶ 24–27.) The Complaint describes "CAD Download Software" as a separate piece of software that "allowed customers to open technical drawings of [End-of-Arm tooling] components and assemblies from

2

the SAS website with a single mouse click directly into a variety of widely commercially available CAD software packages." (Doc. 1, ¶ 32.) Defendants note that the Complaint's description of the functionality of the "CAD Download Software" is wrong, but that is not germane to this motion.

SAS also assigned to the Fisher Family Trust certain rights in "NileMERRY" assets listed in Exhibit C. (Id. at PageID 43–44, 53.) These assets included trademarks, domain names, and website content related to "Nile" and "MERRY" branded industrial tools. (Doc. 1, ¶¶ 38, 43.) These tools are made by a Japanese company (not SAS), but SAS had been reselling them under a distributorship agreement with the manufacturer. (Id., ¶ 38.) The Complaint refers to the assets in Exhibits A and C collectively as the "Carved-Out Assets." (Doc. 1, ¶ 1.)

To permit SAS customers to continue to use the mySAS App and CAD Download Software, Fisher and SAS signed a separate License Agreement. (Doc. 1, ¶¶ 46–48; see also Doc. 1-2.) In this license, Fisher, through Fisher Enterprises, granted SAS a "nonexclusive, worldwide, royalty-free license" license, subject to certain terms, to continue to use the software for the mySAS App, the CAD Download software, and certain other intellectual property. (Doc. 1-2 at PageID 55–56, 64.)

Defendants are alleged to have continuously stalled or refused to transfer all of the Carved-Out Assets to the Fisher Trust, causing detrimental harm to the Plaintiffs. Thereafter, Defendants allegedly began a campaign in 2020 launching a new mobile phone application strikingly similar in appearance and function to the mySAS App – a portion of the Licensed IP owned by Fisher Enterprises. (Doc. 1, PageID 21, ¶¶54–56). Despite once again requesting full compliance with the transfer under the IPAA as well as bringing attention to SAS's breach of the License Agreement, Defendants ignored the requests and failed to cure their breaches. (Doc. 1, PageID 24, ¶64).

Plaintiffs claim that on April 21, 2020, Plaintiffs' counsel sent a letter accusing SAS of breaching the License Agreement. (Doc. 1, ¶ 59; see also Doc. 1-7.) The letter suggested that SAS had breached the license by, inter alia, making available a mobile phone app called "piParts" (the "piParts App"), which, the letter claimed, had been created by SAS in violation of the License Agreement. (Doc. 1-7 at PageID 83.) The letter also asserted that SAS had breached the License Agreement by making the new piParts App "available to Piab." (Id.) The letter did not, however, explain how SAS had made the piParts App "available to Piab," which Piab entity SAS had supposedly made the app available to, what that entity did with it, or why this amounted to a breach of the License Agreement. The letter also claimed that SAS had breached both the IP Assignment Agreement and License Agreement by failing to deliver certain of the "Carved-Out Assets" to the Fisher Family Trust. (Id. at PageID 84.)

Defendants assert that counsel for SAS responded with a letter explaining that there had been no breach that would entitle Fisher Enterprises to terminate the License Agreement.

On June 1, 2020, Plaintiffs' counsel sent SAS another letter purporting to terminate the License Agreement based on SAS's alleged failure to remedy Plaintiffs' concerns within the 30-day cure period permitted by the license. (Doc. 1, ¶ 64.)

Five days later, on June 5, 2020, Plaintiffs filed the Complaint, asserting several claims against Defendants arising out of the IP Assignment and License Agreements. The Complaint alleges that:

> SAS breached the License Agreement (Count 7) by using the licensed source code behind the mySAS App, without Fisher Enterprises' permission, to create the piParts App and by "distributing and disclosing" this source code, the source for the CAD Download software, and related know-how to Piab USA and Piab AB (Doc. 1, ¶ 127);

4

> SAS and Piab USA and Piab AB, committed copyright infringement (Counts 1 and 2) and trade secret misappropriation under both federal and state law (Counts 3 and 4) through these acts (id., ¶¶ 77, 83, 93, 98, 104); and
>
> SAS breached the IP Assignment Agreement (Count 5) and committed the tort of conversion (Count 6) by failing to deliver certain of the "Carved-Out Assets" to the Fisher Family Trust as allegedly required under that agreement. (Id., ¶¶ 113, 118.)

Among other things, the Complaint seeks $3,000,000 in punitive damages for the alleged violations of Ohio trade secret law, $2,000,000 in punitive damages for the alleged violations of federal trade secret law, and statutory damages for the alleged copyright violations. (Id. at PageID 38–39; see also id., ¶ 88.)

## II.    Standard

"The purpose of a Rule 12(b)(6) motion to dismiss is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp. 2d 892, 897 (S.D. Ohio 2013) (citing *Mayer v. Mylod*, 988 F. 2d 635, 638 (6th Cir. 1993)). Moreover, the purpose of the motion is to test the formal sufficiency of the statement of the claim for relief. *Id.* "[F]or the purposes of a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff and its allegations taken as true." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232 (1974)).

To survive a 12(b)(6) motion to dismiss, a plaintiff must provide more than labels and conclusions; a formulaic recitation of the elements of a cause of action is not enough. *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). Further, the factual allegations must be enough to raise a right to relief above the speculative level and must also do something more than merely create a suspicion of a legally cognizable right. *Id.* However, the Court is not bound to accept as

5

true a legal conclusion couched as factual allegation or unwarranted factual inferences. *Id.* at 555; *Morgan v. Church's Fried Chicken*, 829 F. 2d 10, 12 (6th Cir. 1987); *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Moreover, only well-pleaded facts are construed liberally in favor of the party opposing the motion to dismiss. *Lillard v. Shelby County Bd. Of Educ.*, 76 F. 3d 716, 726 (6th Cir. 1996).

**III.     Analysis**

Defendants request that the Court dismiss Plaintiffs' conversion claim against SAS in its entirety, including Plaintiffs' demand for punitive damages. Count 6 of the Complaint asserts a common-law conversion claim against SAS, including a request for punitive damages. (Doc. 1, ¶¶ 117–22.) The Complaint is clear, however, that Plaintiffs' conversion claim is based on SAS's alleged breach of a contractual duty. Under Ohio law, when the alleged breach is of a duty created by contract, "the cause of action is one of contract, not tort." *Acad. Imaging, LLC v. Soterion Corp.*, 352 F. App'x 59, 64 (6th Cir. 2009) (quoting *Cuthbert v. Trucklease Corp.*, 10th Dist. Franklin No. 03AP-662, 2004-Ohio-4417, ¶ 44)).

"In Ohio, a tort claim for common law conversion is one that alleges the defendant[] exercised dominion or control wrongfully over the property of another, in denial of or under a claim inconsistent with their rights." *DeNune v. Consol. Capital of N. Am., Inc.*, 288 F. Supp. 2d 844, 853–54 (N.D. Ohio 2003) (citing *Ohio Telephone Equipment & Sales, Inc. v. Hadler Realty Co.*, 24 Ohio App. 3d 91, 93, 493 N.E. 2d 289 (10th Dist. 1985)). Count 6 alleges that SAS interfered with Fisher's rights in, and possession of, some of the so-called "Carved-Out Assets," defined in the Complaint as the assets listed in Exhibits A and C to the IP Assignment Agreement. (Doc. 1, ¶¶ 1, 118–19.) Exhibit A to the IP Assignment Agreement lists (1) the "Software for the MySAS application," (2) "CAD Download Software," and (3) "all Intellectual Property

6

exclusively related thereto" (except for certain trademarks), and Exhibit C relates to the NileMERRY assets. (Doc. 1-1 at PageID 51, 53; see also supra at 3.) The Complaint alleges that SAS was late in delivering some of the "Carved-Out Assets" to the Fisher Family Trust and did not deliver others (the so-called "Withheld Assets"). (Doc. 1, ¶¶ 71, 118–19.)

In Count 5, however, Plaintiffs bring a breach-of-contract claim against SAS, alleging that SAS breached the IP Assignment Agreement by failing to either timely deliver, or deliver at all, the same group of assets that Plaintiffs later reference in the conversion count. (Doc. 1, ¶ 113 (alleging that SAS "breached its contractual obligations" under the IP Assignment Agreement because it "did not timely transfer certain of the "Carved-Out Assets" set out in Exhibit C" and "never transferred the Withheld Assets").) Plaintiffs do not suggest that SAS owed any independent duty to deliver the "Carved-Out Assets" that was separate from SAS's obligations under the IP Assignment Agreement. To the contrary, the conversion count explicitly states that SAS's duty to deliver these assets arose under that very agreement. (Doc. 1, ¶ 118 (alleging that SAS failed to transfer the "Carved-Out Assets" "as required by the IPAA").)

Under Ohio law, "[a] tort exists only if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed." *Battista v. Lebanon Trotting Asso.*, 538 F.2d 111, 117 (6th Cir. 1976). By contrast, "[w]hen an alleged breach is of a duty that is created by a contract and is 'independent of any duty imposed by law, the cause of action is one of contract, not tort.'" *Acad. Imaging*, 352 F. App'x at 64 (internal citation omitted). Thus, "a conversion action cannot be maintained against a party to a contract unless the conversion claim alleges that the breach of duty owed is separate from obligations created by the contract between the parties." *Ncua Bd. v. Zovko*, No. 1:13-CV-1430, 2015 U.S. Dist. LEXIS 198096, *20 (N.D. Ohio Sept. 30, 2015) (internal citation omitted). Plaintiffs do not

7

allege that SAS had an independent duty to deliver the "Carved-Out Assets" outside of the IP Assignment Agreement.

The principle that a "party cannot receive relief in tort law when the claim arises out of contractual duties" is rooted in the "economic loss rule." *Ncua*, 2015 U.S. Dist. LEXIS 198096, *19–20 (internal citation omitted). This rule "prevents a plaintiff who has suffered only economic losses from recovering tort damages." Id. (internal citation omitted). Plaintiffs are attempting to re-plead their breach-of-contract claim as a conversion claim. "No punitive damages are available for breach of contract in Ohio." *Klusty v. Taco Bell Corp.*, 909 F. Supp. 516, 522 (S.D. Ohio 1995) (internal citation omitted).

Plaintiffs try to avoid the limitation against punitive damages in contract actions by adding a conversion count immediately following their breach-of-contract claim, asserting that SAS's alleged conduct as "willful and intentional," and then seeking punitive damages on this basis. But the mere addition of words like "willful[]" or "intentional[]" "do[es] not change the nature of the cause of action" from contract to tort. *Schwartz v. Bank One, Portsmouth, N.A.*, 84 Ohio App. 3d 806, 810, 619 N.E.2d 10, 12 (1992).

Plaintiff's response asserts that Fisher Enterprises was not a named party to the IP assignment agreement. Fisher Enterprises was, however, an intended beneficiary of the IP Assignment Agreement. (Doc. 1, ¶¶ 10, 109). SAS was obligated to transfer the Carved-Out Assets to the Fisher Trust for delivery to Fisher Enterprises. (id., ¶ 118). The complaint alleges that SAS breached its "contractual obligations to the Fisher [Family] Trust and Fisher Enterprises" by failing to deliver the "Carved-Out Assets" to the Fisher Family Trust. (Id., ¶ 113.) SAS violated a contractual duty to Fisher Enterprises by allegedly failing to transfer the "Carved-Out Assets."

8

That the License Agreement was purportedly terminated on June 1, 2020 (see Doc. 19, PageID 205) does not clear the way for Plaintiffs to pursue a conversion claim either, because the License Agreement has nothing to do with the conversion claim. According to the Complaint, the in IP Assignment Agreement SAS promised to deliver the "Carved-Out Assets" to the Fisher Family Trust for the benefit of Fisher Enterprises, and it is this agreement that the Complaint alleges SAS violated by failing to deliver some of those assets. Meanwhile, the License Agreement is a separate agreement, in which Fisher Enterprises agreed to license some of the "Carved-Out Assets" (including the mySAS Apps and the CAD Download software) back to SAS. (See Doc. 1, ¶¶ 1, 46.) Neither the existence of this agreement nor its alleged termination by Fisher Enterprises has any relation to Plaintiffs' conversion claim or to the underlying basis for Defendants' Motion. SAS's alleged duty to transfer the "Carved-Out Assets" under IP Assignment Agreement is contractual in nature, and its alleged breach of this duty cannot give rise to a claim for conversion. Thus, the Court will dismiss Plaintiffs' conversion count (Count 6) for failure to state a claim.

Defendants also request that the Court dismiss Fisher Enterprises' federal- and state-law claims against Defendants for trade secret misappropriation to the extent that those claims seek punitive damages. In Counts 3 and 4, Fisher Enterprises alleges that all three Defendants misappropriated Fisher Enterprises' trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA") and the Ohio Uniform Trade Secrets Act ("UTSA"), respectively. (Doc. 1, ¶¶ 90–107.) The trade secrets that Fisher Enterprises alleges were misappropriated consist of (1) the software for the mySAS App, (2) CAD Download software, and (3) related know-how, the rights to all of which Fisher Enterprises claims to have obtained (through the Fisher Family Trust) via the IP Assignment Agreement. (Id., ¶ 53.) While the Complaint admits that Fisher Enterprises licensed these assets back to SAS through the License Agreement (id., ¶¶ 29, 35, 46), it alleges

9

that SAS subsequently committed trade secret misappropriation when it used the relevant software and associated know-how to develop the piParts App and also supposedly disclosed these confidential materials to Piab USA and Piab AB. (Id., ¶¶ 53, 93.) The Complaint alleges that Piab USA and Piab AB are themselves liable for trade secret misappropriation because both "knew or reasonably should have known that receipt and use of the Confidential Material were unlicensed and wrongful acts." (Id., ¶ 98.).

The Complaint never alleges, however, any specific facts to suggest that SAS ever disclosed any of Fisher Enterprises' alleged trade secrets to Piab USA and Piab AB, or that either of the Piab entities ever actually used those trade secrets in an improper manner. Fisher Enterprises alleges that Defendants' alleged acts of misappropriation were "willful and malicious," thus entitling it to an award of millions of dollars in punitive damages. (Doc. 1, ¶¶ 98, 106; see also id. at 39.) But Fisher Enterprises has failed to plead facts that would entitle it to punitive damages in connection with the trade secret claims.

The DTSA allows punitive damages (in an amount not to exceed twice the amount of any non-punitive damages) only in cases where the trade secret was misappropriated "willfully and maliciously." 18 U.S.C. § 1836(b)(3)(C). The Ohio UTSA conditions an award of punitive damages (not to exceed three times the amount of non-punitive damages) on proof of "willful and malicious misappropriation." Ohio Rev. Code Ann. § 1333.63(B). Thus, punitive damages are available for trade secret violations only where the misappropriation was both "willful, i.e., done with actual or constructive knowledge of its probable consequences" and "malicious, i.e., done with an intent to cause injury." 4 *Milgrim on Trade Secrets* § 15.02 (2020) (internal quotation marks omitted). "Malice" is not defined in the DTSA, but courts typically look to the state UTSA when interpreting the DTSA inasmuch as the two are substantively identical. See, e.g., *Kuryakyn*

*Holdings v. Ciro*, 242 F. Supp. 3d 789, 797 (W.D. Wis. 2017) (internal citation omitted). Under Ohio law, "malice" is the "state of mind under which a person intentionally does a wrongful act without a reasonable[,] lawful excuse and with the intent to inflict injury or under circumstances from which the law will infer an evil intent." *Criss v. Springfield Twp.*, 56 Ohio St. 3d 82, 84, 564 N.E. 2d 440 (1990) (citing *Black's Law Dictionary* 956 (6th ed. 1990)).

Plaintiffs recite that the requisite degree of "malice" does not require an "intent to injure" and can exist where the defendant had a "conscious disregard for the rights of other persons." (Doc. 19, PageID 208 (quoting *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 489 (6th Cir. 2002)).) This remains a high bar. The Ohio Supreme Court has clarified that the "conscious disregard for the rights of other persons" standard refers to a "mental state so callous in its disregard for the rights and safety of others that society deems it intolerable." *Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416 (Ohio 1991). Thus, "[l]iability for punitive damages is reserved for particularly egregious cases involving deliberate malice or conscious, blatant wrongdoing which is nearly certain to cause substantial harm." *Spalding v. Coulson*, No. 70524, 1998 Ohio App. LEXIS 4105, at *16 (Ohio Ct. App. Sept. 3, 1998). "In other words, 'to warrant the imposition of additional punitive damages, above and beyond compensatory damages, the tort must be committed with a particularly depraved mental state,'" and mere "[r]ecklessness or carelessness" will not suffice. *Psychiatric Solutions v. Waller Lansden Dortch & Davis*, LLP, 2014 U.S. Dist. LEXIS 183594, at *28 (N.D. Ohio June 4, 2014) (quoting *Spalding*, 1998 Ohio App. LEXIS 4105, at *16).

The Complaint does not plead factual matter that would suggest that SAS, Piab USA, or Piab AB engaged in any "willful and malicious" conduct. Count 3 alleges trade secret misappropriation under the DTSA, but does not allege that SAS acted with any malice towards

11

Fisher Enterprises in supposedly misappropriating its trade secrets. (See Doc. 1, ¶¶ 90–99.) As regards Piab AB and Piab USA, Count 3 includes only a single allegation that both acted with "willfully and maliciously," but contains no facts in support of this assertion. (Id., ¶ 99.) Similarly, Count 4 asserts trade secret misappropriation under the Ohio UTSA, but alleges only that the alleged misappropriation was "willful [and] malicious," without describing any specific "willful [and] malicious" acts or attributing these acts to any particular Defendant. (Id., ¶ 106.)

Under *Iqbal* and *Twombly*, simply "calling Defendants acts 'willful' or 'malicious' without describing those acts or any attendant circumstances is not enough to plead state of mind." *Roller v. Brennan*, No. 2:17-cv-241, 2018 U.S. Dist. LEXIS 158043, at *19 (S.D. Ohio Sept. 17, 2018). "[A]lthough conditions of a person's mind may be alleged generally, the plaintiff still must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation plausible on its face." Id. (quoting *Katoula v. Detroit Entm't, LLC*, 557 F. App'x 496, 498 (6th Cir. 2014)). Because Fisher Enterprises pleads no such facts here, its demands for punitive damages under the DTSA and Ohio UTSA will be dismissed. See *Xoran Holdings LLC v. David Luick & Tungsten Med. Network, LLC*, No. 16-13703, 2017 U.S. Dist. LEXIS 147868, *18 (E.D. Mich. Sept. 13, 2017) (dismissing the plaintiffs' request for punitive damages under the DTSA for failure to plead "any facts to support [their] conclusory allegation" of malicious conduct); see also *Bearhs v. Steven K. Bierly Trucking Operating Co.*, No. 2:18-cv-1400, 2019 U.S. Dist. LEXIS 120744, at *10 (S.D. Ohio July 19, 2019) (finding the plaintiffs' conclusory allegations of malice to be "mere 'naked assertions devoid of further factual enhancement'" and insufficient to make their claim for punitive damages for negligence "plausible on its face" (quoting *Iqbal*, 556 U.S. at 678)).

Even if this were not the case, Fisher Enterprises cannot recover punitive damages from SAS under the terms of the License Agreement. The "Limitation of Liability" provision in the License Agreement between SAS and Fisher Enterprises provides:

> Except for the indemnification obligations of the Parties set forth in Section 9 hereto, in no event will either Party be liable to the other Party for any consequential, incidental, punitive, or special damages whatsoever, including, without limitation, any damages relating to or associated with business earnings, profits, or goodwill or any other damages or injury arising from or relating to the Licensed IP or any use or exercise of the License granted herein, regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, infringement of intellectual property rights, failure of essential purpose or otherwise, even if advised of the possibility of such damages.

(Doc. 1-2 at PageID 57 (capitalization omitted).) The "Limitation of Liability" clause thus states that neither party to the License Agreement will be liable to the other party for any "punitive damages" that may "aris[e] from or relat[e] to the Licensed IP or any use or exercise of the License granted herein," irrespective of the cause of action giving rise to such damages. The punitive damages that Fisher Enterprises seeks in connection with its trade secret claims are punitive damages that "aris[e] from or relat[e] to the Licensed IP."

The Licensed IP is defined in the "Recitals" section of the License Agreement to encompass the intellectual property assets listed in Exhibit A to that agreement, which include the "Software for the 'MySAS application'" and "CAD download Software." (Doc. 1-2 at PageID 55, 64.) This software and the know-how associated with it are what Fisher Enterprises alleges has been misappropriated by SAS. Thus, the Complaint alleges that SAS's "[Kevin] Roundtree and unknown others used Fisher Enterprises' confidential information to develop the piParts App in violation of federal and Ohio trade secret law" (Doc. 1, ¶ 53); that this confidential information included the software for the "Software Works," defined in the Complaint as the software for

13

mySAS App and CAD Download software, and related know-how (id., ¶¶ 1, 53); and that SAS's alleged acts of misappropriation also included the "transfer and distribution" of these confidential materials to Piab USA and Piab AB "without any legitimate need for Piab to know that information." (Id., ¶ 93.) Because there is thus no question that Fisher Enterprises' requests for punitive damages against SAS in connection with its trade secret misappropriation claims "aris[e] from or relat[e] to the Licensed IP," they are precluded by the "Limitation of Liability" provision.

The fact that the "Limitation of Liability" clause is subject to the "indemnification obligations of the Parties set forth in Section 9" to the License Agreement does not change this outcome. The "Indemnification" provision (which is in fact Section 8 of the agreement, not Section 9) provides:

> Each Party shall indemnify and hold harmless the other Party and its officers, directors, employees, agents, and shareholders (each, an "Indemnitee") from and against any and all Losses based upon, arising out of or otherwise in respect of:
>
> (a) any claims related to the use of the Licensed IP by or on behalf of the indemnifying Party; and
>
> (b) breach or violation of any provision contained in this Agreement by or on behalf of the indemnifying Party.

(Doc. 1-2 at PageID 57.)

The duty to indemnify is limited to "Losses." Though the definition of this term is not explicitly stated in the License Agreement itself, the agreement provides that "terms used [herein] that are capitalized and not otherwise defined have the meanings given to them in the Purchase Agreement" (referred to in the Complaint as the "Equity Agreement"). (Doc. 1-2 at PageID 55.) The Purchase Agreement, in turn, defines "Losses" to exclude "any treble, punitive or exemplary

damages."[1] (Ex. A at 6-7.) Thus, Fisher Enterprises' requests for punitive damages against SAS are barred regardless of whether its trade secret claims are subject to the "Limitation of Liability" or "Indemnification" provisions.

Plaintiffs also claim that the Limitation of Liability clause is "unenforceable as a violation of Ohio's public policy." (Doc. 19, PageID 212.) No public policy in Ohio prevents parties from expressly allocating liability among themselves. *Ind. Mich. Power Co. v. Siemens Energy, Inc.*, No. 2:12-CV-00861, 2013 U.S. Dist. LEXIS 121852, at *19 (S.D. Ohio Aug. 26, 2013). The case cited by Plaintiffs, *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 375 N.E.2d 410 (1978), stands for the proposition that a contract of adhesion may not be used to insulate a party from liability for willful or wanton misconduct. Here, the License Agreement is not alleged to be a contract of adhesion. It is alleged to have been negotiated by two commercial entities, in connection with a transaction into which Fisher did not have to enter. See *Enduring Wellness, L.L.C. v. Roizen*, 8th Dist. Cuyahoga No. 108681, 2020-Ohio3180, ¶¶67-68. Plaintiffs' punitive-damages requests will therefore be dismissed under Rule 12(b)(6).

Defendants also request that the Court dismiss Fisher Enterprises' copyright infringement claim against Defendants to the extent that it seeks statutory damages. In Counts 1 and 2, Fisher Enterprises alleges that SAS, Piab USA, and Piab AB infringed its copyright in two copyrighted works, which had been assigned to the Fisher Family Trust in the IP Assignment Agreement. These two works, collectively referred to in the Complaint as the "mySAS App works," consist of the software for the iOS and Android versions of the mySAS App, respectively. (Doc. 1, ¶¶ 1, 75–78,

---

[1] While the Purchase Agreement was not attached to the Complaint, it was repeatedly referenced there, including to establish the definitions of certain other terms not otherwise defined in the License Agreement. (See, e.g., Doc. 1, ¶ 1 n.3.) It is appropriate for the Court to consider the definition of the term "Losses" in the Purchase Agreement, attached as Exhibit A to this motion, in ruling on SAS's Rule 12(b)(6) argument. A court evaluating a motion to dismiss is free to consider "exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016).

82–84.) Fisher Enterprises seeks statutory damages for Defendants' alleged infringement. (Id., ¶ 88; see also id. at PageID 38.) However, because the Complaint alleges that this infringement commenced before the effective date of the relevant copyright registrations, the request for statutory damages is squarely foreclosed by statute.

The Copyright Act provides that the copyright owner may elect to recover, in lieu of actual damages and profits, an "award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally," in an amount ranging from $750 to $30,000. 17 U.S.C. § 504(c)(1). Where infringement is willful, the court may increase the award of statutory damages up to $150,000. Id. § 504(c)(2). Under this section, the total number of "awards" of statutory damages that a plaintiff may recover in any given action "depends on the number of works that are infringed and the number of individually liable infringers, regardless of the number of infringements of those works." *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143–44 (5th Cir. 1992).

Moreover, 17 U.S.C. § 412 provides an important limitation on the availability of statutory damages. Under this section, "no award of statutory damages . . . shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." "[I]nfringement 'commences' for purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs." *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998).

The Complaint alleges that Defendants first infringed the mySAS App works through their development of the piParts App, which the Complaint claims is a "pirated" version of the mySAS

App created in violation of the terms of the License Agreement. (Doc. 1, ¶¶ 30.) It is entirely unclear from the Complaint what specific role each Defendant played in the creation of the allegedly infringing piParts App. Instead, the Complaint includes Defendants' actions together with allegations that "SAS, Piab USA and Piab AB all coordinated the switch over from the mySAS App to piParts App." (Id., ¶ 54.) The Complaint alleges the following timeline:

> Date of publication: The Complaint alleges that the iOS and Android versions of the mySAS App were released to the public no later than September 20, 2016 and October 3, 2016, respectively. (Id., ¶ 23.)
>
> Date of first infringement: The Complaint alleges that Defendants created the iOS version of the allegedly infringing piParts App no later than January 17, 2020, when it was made available to the public. (Id., ¶ 51.) The Complaint also alleges that Defendants created the Android version of the piParts App no later than March 1, 2020, when it was "set to go live on the Google Play Store." (Id.)
>
> Date of registration: The Complaint concedes that Fisher Enterprises did not register the copyright in either of the mySAS App works until April 14, 2020. (Id., ¶ 31.)

The Complaint alleges that Defendants' purported infringement of the mySAS App works "commenced after first publication of the work[s] and before the effective date of [their] registration[s]" (i.e., April 14, 2020). Given these allegations, Fisher Enterprises cannot recover any statutory damages under § 504(c)(1).

Plaintiffs concede that Defendants developed the two piParts Apps, and thus commenced their alleged infringement of the two copyrighted mySAS Apps, before the date of the copyright registrations, the Copyright Act precludes Fisher Enterprises' request for statutory damages. See 17 U.S.C. § 412(1). Section 412(1) "leaves no room for discretion," precluding statutory damages "so long as the infringement commenced before registration of the copyright," that is, so long as "the first act in a series of acts constituting continuing infringement" occurred prior to registration. *Johnson v. Jones*, 149 F.3d 494, 505-06 (6th Cir. 1998); see also *Mason v. Montgomery Data, Inc.*,

967 F.2d 135, 143-44 (5th Cir. 1992) (precluding recovery of statutory damages "for infringements that commenced after registration if the same defendant commenced an infringement of the same work prior to registration").

Fisher Enterprises split its copyright claim into two separate counts. First, it pleads Count 1, which it says is based on allegedly infringing acts occurring before the April 14, 2020, copyright registration date. (Doc. 1, ¶ 76.) Fisher Enterprises does not seek statutory damages in Count 1. In other words, it does not assert that it is entitled to statutory damages based on Defendants' alleged development and use of the piParts App, which the Complaint affirmatively alleges commenced before the April 14, 2020, registration date. However, Fisher Enterprises pleads Count 2 based on allegedly "new and independent acts of infringement" commencing after the April 14, 2020, registration date. (Id., ¶ 82.) These "new and independent" post-registration infringing acts include, according to the Complaint, the "unlicensed misuse of the copyrighted software works after Fisher Enterprises terminated the License Agreement." (Id., ¶ 88.) Fisher Enterprises' theory seems to be that once it purported to terminate the License Agreement on June 1, 2020, SAS no longer had a valid license to the software for the mySAS App works, such that its continuing use of even the mySAS App after that date now amounted to a "new and independent" copyright violation, entitling Fisher Enterprises to statutory damages. (Id., ¶ 64.)

However, for purposes of § 412, if a defendant committed an alleged act of infringement prior to the plaintiff's registration of the allegedly infringed work, then the plaintiff may not recover statutory damages. Thus, § 412 precludes a plaintiff from recovering an award of statutory damages "for infringements that commenced after registration if the same defendant commenced an infringement of the same work prior to registration." *Mason*, 967 F.2d at 144. If, following registration, the defendant infringed the same work again, this still would not entitle the plaintiff

to statutory damages—even where the new post-registration act of infringement is arguably "different in kind" from the preregistration infringement. *S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*, 946 F.3d 780, 785 (5th Cir. 2020); see also 2 *Nimmer on Copyright* §7.16(C)(1)(c) (2019) ("The bar on awarding heightened damages applies . . . even if the sole defendant, after registration, engaged in a different type of infringement from its pre-registration conduct."). This reading of § 412 harmonizes that provision with § 504(c), which provides for statutory damages "for all infringements involved in the action, with respect to any one work." As the Fifth Circuit explained in *Mason*, "[i]t would be inconsistent to read section 504 to include all of one defendant's infringements of one work within 'an award of statutory damages,' and then read section 412 to treat each infringement separately for purposes of barring that award." Id.

Fisher Enterprises alleges that Defendants first infringed its copyright in the mySAS App works before it registered those works with the Copyright Office. Accordingly, § 412 precludes Fisher Enterprises from recovering an award of statutory damages. The Court will therefore dismiss Count 2 of the Complaint to the extent that it purports to seek statutory damages.

**IV.     Conclusion**

Because Plaintiffs' conversion claim arises from a contractual relationship, Plaintiffs' conversion count (Count 6) for failure to state a claim is **DISMISSED**. Because the complaint does not allege willful or malicious conduct and because they are contractually foreclosed, the request for punitive damages federal-law and state-law for trade secret misappropriation in Counts 3 and 4 are **DISMISSED**. Because § 412 precludes recovery an award of statutory damages when the copyright is first infringed before the work is registered with the Copyright Office, the request for statutory damages in Counts 1 and 2, are **DISMISSED**. Thus, the Motion to Dismiss for Failure

to State a Claim by Defendants SAS Automation, Piab USA, Inc., and Piab AB, (ECF 10), is **GRANTED**.

  **DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, March 31, 2021.


                          s/Thomas M. Rose
                   _____
                           THOMAS M. ROSE
                      UNITED STATES DISTRICT JUDGE