**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**Trent P. Fisher Enterprises, LLC,** *et al.***,**

        *Plaintiffs,*

**v.**
                            **Case No. 3:20-cv-216
Judge Thomas M. Rose**

**SAS Automation, LLC,** *et al.***,**

        *Defendants.*

---

**ENTRY AND ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS PIAB AB, PIAB USA, INC., SAS AUTOMATION, LLC, DOC. 81, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY ON COUNTS NINE AND TEN OF THE SECOND AMENDED COMPLAINT AND COUNT ONE OF DEFENDANTS' COUNTERCLAIM. DOC. 101.**

---

Plaintiffs Trent P. Fisher Enterprises, LLC and The Fisher Family Dynasty Trust Dated July19, 2007 have brought suit against SAS Automation, LLC, Piab USA, Inc., and Piab AB, asserting claims of copyright infringement, trade secret misappropriation, breach of an intellectual property assignment agreement, conversion,[1] breach of a license agreement, declaratory judgment that it did not wrongfully terminate the license agreement and wrongfully removed or altered copyright management information. Pending before the Court are Motion for

---

1 The Court previously granted Defendants' Motion to Dismiss the conversion claim. Doc. 28.

1

Summary Judgment by Defendants Piab AB, Piab USA, Inc., SAS Automation, LLC., Doc. 81, and Plaintiffs' Motion for Summary Judgment as to Liability on Counts Nine and Ten of the Second Amended Complaint[2] and Count One of the Counterclaim. Doc. 101. Because genuine issues of material fact remain regarding most issues, Plaintiffs' motion will be denied and Defendants' motion will be granted in part with regard to limitations on damages and denied in all other respects.

## I. Background

Trent Fisher founded the robotics company SAS Automation in the late 1990's. (Dep. Tr. Trent Fisher, Vol. I, 10/13/2022, Doc. 67 ["Fisher Dep., Vol. I"], 26:24-27:7, 29:6-14, 30:16-23, PageID 3113-14). SAS sold off-the-shelf individual components and helped customers design and build complete tools for robotic end-of-arm-tooling, a class of products that includes a variety of robotic gripping tools used in material handling. (Id., 38:13-23, PageID 3116, 24:10-25, PageID 3112). Before Trent Fisher sold the company, Plaintiff The Fisher Family Dynasty Trust Dated July 19, 2007, (hereinafter, "the Trust") owned almost all membership interest in SAS. (Id., 67:5-16, PageID 3123; also see Dep. Tr. Mary Fisher, 12/6/2022, Doc. 65 ["M. Fisher Dep."], Ex. 182, PageID 2679-735, 7:19-9:8, PageID 2647). Trent Fisher and his wife, Mary Fisher, are co-trustees of the Trust. (Fisher Dep. Vol. I., 66:14-17, PageID 3123).

From 2015 through 2016, SAS developed an e-commerce platform with help from its new Information Technology Manager, Kevin Roundtree, who did the bulk of the coding and development. (Dep. Tr. Kevin Roundtree, 8/4/2022, Doc. 48 ["Roundtree Dep."], 52:12-19, PageID 1066). To develop this software, Roundtree initially learned SAS's business and worked

---

2 Plaintiffs' motion contains in its title "Second Amended Complaint." While Plaintiffs have now filed a Third Amended Complaint, doc. 98, by agreement of the parties, the motion now addresses the Third Amended Complaint. Counts Nine and Ten of the second and third amended complaints are the same.

with sales and marketing personnel to gather business requirements for the software. (Id., 57:2-12, 57:25-58:14, PageID 1067-68; id., 78:24-79:7, PageID 1073).

Roundtree built the SAS e-Commerce Platform using an open source software program called OpenCart as a baseline, augmenting it with a custom, unique code ("SAS Custom Extensions") he wrote to enhance the program's functionality and allow it to communicate with SAS's systems. (Id., 62:2-19, PageID 1069). OpenCart is a free, open source program that provides users with a basic e-commerce storefront. OpenCart 2, the version Roundtree used, was licensed under an open source license called the GNU General Public License, version 3 ("GPLv3" or "GPL"). (Id., 277:1-9, PageID 1122; Dep. Tr. Monty Myers, Doc. 76 ["Myers Dep."], 295:25-296:15, PageID 4819). The GPLv3 is an open source software license written by and copyrighted to the Free Software Foundation, Inc. (Myers, Dep., Ex. 331, PageID 5361-66; id., 201:20-202:16, PageID 4795-96).

The GPL obliges a developer to publicly disclose source code and make the work available for free use if the software is considered a "covered work" and is "conveyed" to a third party. (Doc. 76-9, Ex. 331, § 2, PageID 5362; Dep. Tr. Joshua HelfinSiegel, Doc. 87 ["HelfinSiegel Dep."], 92:7- 93-3, PageID 6016). Generally, only a "covered work" based on a GPL-licensed program is subject to the license. (Doc. 76-9, Ex. 331, § 0, PageID 5361-62). A developer of a "covered work" cannot restrict its modification or use if the work is "conveyed" to a third party. (Id.)

The SAS Custom Extensions added several features to fit the OpenCart program to SAS's business needs. (Roundtree Dep., 85:11-86:13, PageID 1074-75). The Platform drove sales both directly and indirectly, by providing customers multiple ways to order including: (i) placing an order directly and paying online with a credit card; (ii) exporting their shopping cart

3

into a message requesting a purchase order be generated by the customer's purchasing representative; and (iii) simply using the Platform catalogue to find desired components or other information needed for the purchase decision and then emailing, mailing or faxing a purchase order. (Id., 127:2-17, 129:12-21, 132:8-133:14, PageID 1085-86).

Through one specific extension, the "CAD Download Software" or "Open in Fusion 360" button, which Roundtree also developed, customers could download dimensional product drawings straight from the e-Commerce Platform into CAD presentation software, streamlining the delivery of product information. (Id., 134:24-135:6, PageID 1087). The CAD Download Software became active on the e-Commerce Platform in March 2016. (Id., Ex. 9, PageID 1266; id., 103:17-21, PageID 1079).

In 2015-2016 alongside the SAS e-Commerce Platform, Roundtree also developed iOS and Android versions of a mobile application called the mySAS App, using custom code and the requirements feedback he gathered through his time with the sales and marketing team at SAS. (Id., 54:14-18, 56:2-22, 57:2-23, PageID 1067; id., 78:19-79:22, PageID 1073). The mySAS App had the e-commerce functionality and benefits as the SAS e-Commerce Platform, but also augmented SAS's vendor-managed inventory program by allowing SAS's customers and sales personnel to order product straight from a customer's production floor by scanning a barcode label and checking inventory levels of SAS parts. (Id., 79:8-22, 80:2-13, PageID 1073).

The mySAS App did not contain any source code from OpenCart, (Myers Dep., 296:16-22, PageID 4819), but to function, the MySAS App needed access to both the OpenCart Database and the OpenCart Catalog Website. For example, it pulled all product and customer information from the OpenCart Database. (Doc. 48, 08/04/22 Roundtree Tr., PageID 1119, 264:2-17.) In addition, for a user to even get past the initial log-in screen, the MySAS App

needed to validate the user's credentials by fetching information from that same database. (Doc. 87-3, HelfinSiegel Report, PageID 6245, ¶ 62.) Many of the functions available to users via the MySAS App were not performed by the app per se—instead, when the user tapped a button in the app, the app opened a Safari browser window on the user's phone and loaded a webpage from the OpenCart Catalog Website. (Id., PageID 6243-44, ¶ 59.) For example, when a user first installed the MySAS App and tapped the "sign-up" button to set up a new account, the app loaded the "sign-up" page from the OpenCart Catalog Website so that the user could complete the sign-up process there. (Id.) Similarly, when a user filled a shopping cart and tapped the app's "checkout" button, the app simply took the user to the "checkout" page on the OpenCart Catalog Website. (Id.). Thus, the mySAS App cannot operate without modification in connection with any other e-commerce platform; and the only mobile application (other than a standard web browser) capable of running in connection with the SAS e-commerce Platform is the mySAS App. (HelfinSiegel Dep., 130:12-131:24, PageID 6026). The mySAS App launched on the Apple App Store on September 18, 2016. (Roundtree Dep., Ex. 18, PageID 1298-99; id., 143:1-9, PageID 1089).

Both the App and the SAS e-Commerce Platform drew on backend data from the SAS Custom API,[3] and the SAS SQL4 Database. (Id., 232:18-20, PageID 1111; id., 266:5-25, 271:14-272:3, PageID 1120-21; id., 190:2-7, PageID 1101). The SAS Custom API allowed the App to communicate with the SAS e-Commerce Platform, which, in turn, drew on the SAS SQL Database. (Id., 264:9-265:17, PageID 1119).

---

3 API, application programming interface, consists of sets of standardized requests that allow different computer programs to communicate with each other. (*Encyclopedia Britannica*).
4 SQL, structured query language, is a computer language designed for eliciting information from databases. (Id.)

In late 2017, after months of negotiations with Piab AB, a Sweden-based provider of vacuum automation products, which use compressed air to pick up and move products, as opposed to electricity and physical grippers, Trent Fisher CEO agreed to sell SAS to Piab's American subsidiary, Piab USA. (Fisher Dep., Vol. I., Ex. 150, PageID 3206-3271; id., 173:18-23, PageID 3149; id., Ex. 160, PageID 3342-49; id., 268:18-269:10, PageID 3173).

To accomplish the transaction, the parties simultaneously executed three separate contracts on October 31, 2017: the Equity Interest Purchase Agreement ("EIPA"), the Intellectual Property Assignment Agreement ("IPAA"), and the License Agreement. (Doc. 67-3, Ex. 150 (EIPA), PageID 3206-71; Fisher Dep., Vol. I, Ex. 40 (IPAA), PageID 3184-94; id., Ex. 42 (License Agreement), PageID 3195-205; id., 192:25-193:10, PageID 3154).

Trent Fisher and Piab AB could not initially agree on a purchase price. (Dep. Tr. Scott Chapman, Doc. 66 ["Chapman Dep."], 75:18-76:4, PageID 2879). Rather than let the deal die, Fisher and Piab AB agreed to carve out the rights to certain intellectual property assets owned by SAS for Trent Fisher. Piab AB and Piab USA agreed to pay Trent Fisher cash and to convey Intellectual Property rights to him in exchange for the membership interests owned by the Trust. (Id.; Fisher Dep., Vol. I, 261:20-262:15, PageID 3171-72). The Parties refer to these carved-out Intellectual Property assets as the "Transferred IP"). The Transferred IP included the ownership interests in the mySAS App, the mySAS API, the SAS e-Commerce Platform, the SAS Custom Extensions and the SAS SQL Database. (Fisher Dep. Vol. I, 134:3-136:20, PageID 3140).

Trent Fisher agreed to accept a purchase price plus assignment of the Transferred IP from SAS out to Trent Fisher in exchange for all the membership interests in SAS owned by the Trust. (Doc. 67-3, Ex. 150, § 2.2, PageID 3222-24; Fisher Dep., Vol. I, 261:20-262:15, PageID 3171-72).

Under the IPAA, SAS transferred all of the company's "rights, title, and interest in certain Distributed Assets, including the Transferred IP, to the Fisher Trust. (Doc. 67-1, Ex. 40, PageID 3184-94). The Transferred IP included, in part, "[t]he Software for the mySAS Application and the CAD Download Software, and all Intellectual Property exclusively related thereto." (Id.). The IPAA incorporated by reference from the EIPA the definitions of the terms "Software" and "Intellectual Property," thus requiring reference back to that agreement to fully understand the scope of the Transferred IP. (Id., PageID 3184).

The Equity Interest Purchase Agreement defined "Software" broadly to include items like computer programs, databases, development materials, documentation and source code. (Doc. 67-3, Ex. 150, PageID 3220). The agreement also defined "Intellectual Property" broadly to include copyrights, Know-How, trademarks, and all other proprietary rights of any kind. (Id., PageID 3215-16). "Know-How" in turn included trade secrets and other unpatented proprietary and confidential information. (Id., PageID 3216).

While the Trust was to simultaneously assign the Transferred IP to Fisher Enterprises (as confirmed in the EIPA, the IPAA and the License Agreement), there is no evidence that this happened. (see, e.g., Doc. 69, Trent Fisher Depo., PageID 3617-18, "Q: Do you recall anything that you did at the time…on the day of the closing to accomplish this transfer…? A: This says I did it, so I must have done something that conveyed it…I believe it was transferred, but I do not know how at that point in time if it was in writing or not. It may have been a verbal thing I did, but I don't recall how it was done. I just recall that it was done.") On March 27, 2020, Fisher executed a "*nunc pro tunc*" IP Assignment Agreement, purporting to "acknowledge and agree that…the Trust made the Assignment and transferred and assigned the Transferred IP…to Fisher

Enterprises." (Doc. 65-9, M. Fisher Dep., Ex. 190, PageID 2843-44; id., 54:17-55:16, PageID 2659; Doc. 67, Fisher Dep. Vol. I., 194:5-195:2, PageID 3155;).

Trent Fisher agreed to a limited, five-year license for SAS to use some, but not all, of the Transferred IP ("Licensed IP"). (Fisher Dep., Vol. I, 261:20-262:15, PageID 3171-72; id., 195:8-12, PageID 3155; id., Ex. 40, PageID 3184-94; id., 163:6-12, PageID 3147). During negotiations for the Letter of Intent leading to the October 31, 2017 transaction, Fisher refused to include Piab in the License Agreement, insisting the licensed rights extend only to SAS. (Chapman Dep., 84:25-86:10, 87:22-88:19, PageID 2881-82). Fisher believed that the continued use by SAS would cause Piab to see the value of the Software and then they would want to adopt it more widely for a fee. (Fisher Dep. Vol. 1, 100:19-101:4, PageID 3131; Ex. 42, § 9(a), PageID 3198).

According to the License Agreement, Fisher Enterprises gave SAS the right to continue to use and benefit from the Licensed IP but restricted that use. (Id., PageID 3195-205). The Licensed IP consisted of the "[t]he Software for the 'MySAS application' and the 'CAD download Software,'" but did not include the language, "all Intellectual Property exclusively related thereto." (Id., Ex. A, PageID 3204). The License Agreement stated that SAS could not alter, modify, distribute or create derivative works based on the Licensed IP. (Id., § 2, PageID 3196). It also required SAS to maintain and avoid disclosing Confidential Information. (Id., § 10(a), PageID 3198-99).

While the IPAA conveyed the MySAS App and the CAD Download Software to the Fisher Trust, where Fisher hoped he could adapt the app to make it work with other e-commerce platforms and then license it to third parties, Fisher agreed that SAS could continue using both pieces of software in its business for free. Thus, Mr. Fisher made no effort to remove the source code for the MySAS App and the CAD Download Software from SAS's computer servers. (Doc.

48, Roundtree Tr., PageID 1101, 190:19-23.) In fact, as part of the Transaction, Fisher

Enterprises and SAS had signed a separate License Agreement, where Fisher Enterprises

conveyed these software works back to SAS via an explicit, royalty-free license to use "Licensed

IP," defined to specifically include both the MySAS App and the CAD Download Software.

(Doc. 98-2, License Agrmt., PageID 6629, 6638.) Fisher signed the License Agreement on

behalf of both Fisher Enterprises and SAS. (Id., PageID 6637.)

After the transaction, Fisher Enterprises obtained copyright registrations from the U.S.

Copyright Office for both the mySAS iOS App (MySAS - iOS Application, TXu 2-189-120

("mySAS Registration")) and the CAD Download Software (CAD Download Software Code,

TXu 2-207-006 ("CAD Registration")) on April 14 and April 30, 2020, respectively. (TAC, Exs.

3, 5 PageID 843-44, 847; also see Doc. 43, ¶¶31, 37, PageID 875-76) (together, the mySAS

Registration and the CAD Registration are sometimes called the "Copyrighted Works").

Following the sale, Kevin Roundtree officially became a Piab employee as of January 1,

2019. (Roundtree Dep., Ex. 3, PageID 1224-31; id., 32:4-13, PageID 1061; also see id., 32:4-

33:22, PageID 1061). In late 2019, after kicking the idea around and pitching it to several

managers, Roundtree began rebranding the Software Works to adapt them for Piab's use. (Id.,

Ex. 77, PageID 1461-62; id., 336:23-337:2, PageID 1137; id., Ex. 78, PageID 1463-68; id.,

342:1-5, PageID 1139; id., 337:3-16, PageID 1137). The "mySAS App" became the "piParts

App," and the SAS e-Commerce Platform became piParts.shop (the "First Piab e-Commerce

Platform"). (Id., 332:4-333:21, PageID 1136; id., 339:3-20, PageID 1138). Roundtree also

modified the backend SAS Database and SAS Custom API to support the new Piab systems.

(Myers Dep., 277:7-21, PageID 4814; id., 281:6-24, PageID 4815; id., 284:11-23, PageID 4816).

Several Piab managers knew about and approved Roundtree's actions, including Anton Kullh,

9

the one-time head of Robotic Gripping and later the Chief Technology Officer of Piab AB (Doc. 48-50, Ex. 78, PageID 1463-1468; Roundtree Dep., 304:10-19, 305:17-306:6, PageID 1129-30); Kajsa Blixth, the Chief Marketing Officer of Piab AB (Doc. 48-50, Ex. 78, PageID 1463-1468; Dep. Tr. Defendants' 30(b)(6) Rep., Kevin Roundtree, 8/5/2022, Doc. 49 ["Roundtree 30(b)(6) Dep."], Ex. 100, PageID 1718; id., 255:13-21, PageID 1533; id., 14:23-15:5, PageID 1473); and Ed McGovern, head of Piab USA. (Roundtree Dep., Ex. 66, PageID 1433-35; id., 312:15-21, PageID 1131).

After Plaintiffs filed this lawsuit, Piab withdrew and took down customer access to the First Piab e-Commerce Platform and created a Second Piab e-Commerce Platform called "piParts.support," based on OpenCart version 3. (Roundtree 30(b)(6) Dep., 97:20-98:17, PageID 1493-94).

Plaintiffs retained Monty Myers, a software developer with over 40 years of experience in software development, consulting, and expert testimony in intellectual property cases, to compare the source code for the mySAS App to the piParts App; the SAS Custom API to the API used to link the piParts App to the First Piab e-Commerce Platform; the SAS e-Commerce Platform to the First and Second Piab e-Commerce Platforms; the SAS Custom Extensions to the Piab Custom Extensions; and the SAS SQL Database to the Piab SQL Database. (Myers Dep., 283:24-285:18, PageID 4816; id., 291:15-292:4, PageID 4818; id., 293:9-25, PageID 4818; id., 294:1-19, PageID 4819). Myers concluded that Defendants copied the SAS source code for all of the Software Works to create the corresponding Piab software with just a few minor tweaks to rebrand them as Piab tools. (Id., 291:15-292:4, PageID 4818; id., Ex. 325, ¶66, PageID 4923; id., ¶150, PageID 4970; id., ¶186, PageID 4992; Myers Dep., 7:4-12, PageID 4747). Myers also found that the Second Piab e-Commerce Platform contained code substantially the same as the

SAS Custom Extensions. (Id., 293:22-294:12, PageID 4818-19). Roundtree admitted that he copied the source code from Fisher Enterprises' Software to create Piab versions of them. (Roundtree Dep., 332:16-336:8, PageID 1136-37).

Roundtree, Kullh, and McGovern believed they needed permission from Fisher to make any changes to the mySAS App and that Fisher owned the SAS e-Commerce Platform. (Roundtree Dep., 253:6-18, PageID 1116; Ex. 42, § 4, PageID 3197; id., 257:17-258:21, PageID 1117-18; Dep. Tr. Anton Kullh, Doc. 75 ["Kullh Dep."], Ex. 208, PageID 4710-14; id., 204:11-18, PageID 4482; id., 209:2-210:12, PageID 4483-84; Dep. Tr. Edwin McGovern, Doc. 64 ["McGovern Dep."], Ex. 107, PageID 2345-49; id., 199:20-25, PageID 2195; id., 206:10-23, PageID 2197). But no one at SAS ever asked Fisher for permission or informed him before proceeding. (Roundtree Dep., 305:7-16, PageID 1129; id., 258:23-259:10, PageID 1118).

Soon after learning about the public release of the piParts App and launch of the First Piab e-Commerce Platform, on April 21, 2020, Fisher sent Defendants a Notice of Default outlining SAS's suspected breaches of the IPAA and License Agreement. (Dep. Tr. Defendants' 30(b)(6) Rep., Paul Silcox, Doc. 50 ["Silcox 30(b)(6) Dep."], Ex. 119, PageID 1984-89; id., 84:20-85:3, PageID 1796). A month later (after the maximum 30 days allowed to cure a breach under the License Agreement), Defendants responded, asserting they had committed no breach. (Decl. of Trent P. Fisher ["Fisher Decl."], attached here as Ex. A, Ex. 1). Trent Fisher notified Defendants that the License was terminated a week later. (Id., Ex. 2). This lawsuit followed soon after.

Plaintiffs initiated this lawsuit against SAS, Piab USA, and their ultimate parent Piab AB. (Doc. 99-3, Fisher Termination Ltr., PageID 6718; Doc. 1, Compl., PageID 3-4, ¶ 2.) Plaintiffs allege eleven counts. Counts 1-4 assert copyright infringement. Fisher Enterprises claims to have

obtained valid copyright registrations for the MySAS App and the CAD Download Software (Doc. 98, TAC, PageID 6600, 6602, ¶¶ 90, 106.) and alleges that Defendants infringed its alleged copyrights by exceeding the restrictions that the license purported to impose on the use, modification, and distribution of the software. Specifically, it claims that Defendants committed copyright infringement by releasing the piPARTS App and by retaining the CAD Download Software in the OpenCart piPARTS.shop Website. (Id., PageID 6600, 6602-03, ¶¶ 92, 108.)

Counts 5 and 6 assert trade secret misappropriation. Plaintiffs claim ownership of "trade secrets" in not only the MySAS App and the CAD Download Software but also in all OpenCart Extensions, the OpenCart Database, and the OpenCart API (Doc. 76-7, Pltfs.' Interrog. Resp., PageID 5284-307)—that is, in all software that was not conveyed to the Fisher Trust in the IPAA. Plaintiffs claim that Defendants have "misappropriated" Plaintiffs' "trade secrets" in this software by rebranding (1) the MySAS App as the piPARTS App and (2) the OpenCart Catalog Website as the OpenCart piPARTS.shop Website. (Doc. 76-2, Myers Report, PageID 4949-50, 4975-77, 4999, 5023, 5059, ¶¶ 113, 157, 196, 237, 296.)

Count 7 alleges breach of the Intellectual Property Assignment Agreement; Count 9 breach of the License Agreement. Fisher Enterprises alleges SAS breached the License Agreement by exceeding the restrictions that the agreement attempted to impose on SAS with respect to the OpenCart based MySAS App and CAD Download Software and Fisher Enterprises' other "Confidential Information." (Doc. 98, TAC, PageID 6611, ¶ 158.) Count 10 seeks declaratory judgment that Fisher Enterprises did not breach the License Agreement by terminating it without cause. (Doc. 98, TAC, PageID 6612-13, ¶¶ 162-67.) Finally, Count 11 asserts wrongful removal or alteration of copyright management information.

Over a year later, SAS was formally merged into Piab USA. (Doc. 104, Defs.' Answer & Countercl., PageID 7006, ¶ 11.) Later that year, Piab USA launched another e-commerce website, www.piparts.support, to sell the legacy SAS product line. (Doc. 98, TAC, PageID 6579-80, ¶ 30.) Piab USA had built this website on a different version of the open-source OpenCart platform. (Doc. 49, 08/05/22 Roundtree Tr., PageID 1487, 72:1-73:5.) Plaintiffs then amended their Complaint to allege that this OpenCart website also misappropriated their alleged trade secrets. (Doc. 98, TAC, PageID 6605, ¶ 124.)

SAS's counterclaim also seeks declaratory judgment, except SAS asserts that Fisher Enterprises breached the License Agreement by wrongfully terminating it. (Doc. 103, Defs.' Answer & Countercl., PageID 7028, ¶ 1.) Defendants also assert as an affirmative defense the Open-Source General Public License. Defendants assert that "Plaintiffs' claims fail, in whole or in part, because Defendants have been authorized or permitted to perform some or all of the acts complained of in light of at least the General Public License associated with at least OpenCart software." (Doc. 103, Defs.' Answer & Countercl., PageID 7028, ¶ 182.)

## II.    Legal Standard

Summary judgment is required "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A motion for summary judgment must be granted if the nonmoving party who has the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element that is essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment may be denied only if there are genuine issues of material fact that must be resolved by a trier of fact. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby,*

13

*Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact does not exist simply because there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### III. Analysis

Defendants SAS Automation, LLC, Piab USA, Inc., and Piab AB have moved the Court for summary judgment on the following counts of Plaintiffs' Third Amended Complaint (Doc. 56):

> • Counts 1-4 (Copyright Infringement);
>
> • Counts 5-6 (Trade Secret Misappropriation);
>
> • Count 7 (Breach of the Intellectual Property Assignment Agreement);
>
> • Count 9 (Breach of the License Agreement); and
>
> • Count 11 (Removal or Alternation of Copyright Management Information).

The only claims in the Third Amended Complaint on which Defendants are not moving for summary judgment are Plaintiffs' conversion claim (Count 8), which this Court has previously dismissed (Doc. 22, Order on Defs.' Mtn. to Dismiss, PageID 258-61), and Count Ten, Plaintiff Trent P. Fisher Enterprises, LLC's request for a declaratory judgment that it did not wrongfully terminate the License Agreement.

Plaintiffs have filed their Motion for Summary Judgment as to Liability on Counts Nine and Ten of the Second Amended Complaint and Count One of the Counterclaim. Doc. 101. Defendants' Counterclaim mirrors Fisher Enterprises' declaratory judgment claim, asserting that Fisher Enterprises breached the License Agreement by wrongfully terminating it. (Doc. 103, Defs.' Answer & Countercl., PageID 7028, ¶ 1.) Against this claim, as their Eleventh Affirmative Defense, Defendants assert that "Plaintiffs' claims fail, in whole or in part, because

14

Defendants have been authorized or permitted to perform some or all of the acts complained of in light of at least the General Public License associated with at least OpenCart software." (Doc. 103, Defs.' Answer & Countercl., PageID 7028, ¶ 182.)

### A.1. Copyright Infringement

Defendants assert Fisher Enterprises cannot prove that Defendants infringed its copyrights because, they claim, Fisher Enterprises does not own those copyrights. (Doc. 82, Defs.' MSJ, PageID 5715-17.) Proof of copyright infringement requires proof of "ownership of a valid copyright." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Ownership can be acquired "by any means of conveyance or by operation of law." 17 U.S.C. § 201(d). A transfer, other than by operation of law, requires an "instrument of conveyance, or a note or memorandum of the transfer," in "writing." Id. § 204(a).

The Copyright Act provides that a registration secured within five years of completion of the work is entitled to a presumption of validity as it "constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. §410(c) (emphasis added). Copyright in a work of authorship "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). But "in the case of a work made for hire, the employer … is considered the author … unless the parties have expressly agreed otherwise in a written instrument signed by them." Id. § 201(b). Ultimately, Defendants bear the burden of challenging a copyright's validity. *Jedson Eng'g, Inc. v. Spirit Constr. Servs.*, 720 F. Supp. 2d 904, 913 (S.D. Ohio 2010) (citing *HiTech Video Prods. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093 (6th Cir. 1995)).

Fisher Enterprises registered copyrights in the MySAS App and the CAD Download Software. Defendants assert that, because Fisher Enterprises never received a valid assignment of the copyright in those works, its copyright infringement claims fail as a matter of law. Plaintiffs

postulate Fisher Enterprises cannot own the copyrights in the MySAS App and the CAD Download Software absent an assignment from the Fisher Trust (to whom SAS had transferred the copyrights via the IPAA). Indeed, Trent Fisher was required to effectuate this assignment prior to the closing of the Fisher-Piab Transaction on October 31, 2017. When, on the same day, he licensed the MySAS App and the CAD Download Software back to SAS, he did so through Fisher Enterprises (not the Fisher Trust), and so he explicitly "represent[ed] and warrant[ed]" in the License Agreement that the Trust had assigned "all right, title, and interest in and to the Licensed IP" to Fisher Enterprises. But Plaintiffs have produced no evidence that Fisher executed a written assignment as of the closing.

Fisher Enterprises points to a *nunc pro tunc* assignment signed by Fisher before this lawsuit, it purports to "memorialize" an assignment that the Fisher Trust and Fisher Enterprises had entered into as of October 31, 2017. (Doc. 69-8, *Nunc Pro Tunc* Agrmt., PageID 3812-14.) This only emphasizes that Plaintiffs have no contemporaneous written conveyance or evidence of a contemporaneous oral conveyance.

Under 17 U.S.C. § 204(a) the *Nunc Pro Tunc* Agreement is a "note or memorandum of the transfer" (not an "instrument of conveyance"), meaning it "does not itself constitute the transfer" but attempts to "render[] valid and enforceable" a change in ownership that has already occurred. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 827 (3d Cir. 2011). For such a writing to "validate a past transfer, the past transfer must have actually occurred." Id. at 829.

A *nunc pro tunc* assignment itself cannot "both prove[] that an oral transfer occurred and g[i]ve legal effect to that otherwise unenforceable promise." *Barefoot*, 632 F.3d at 832. Otherwise, "a perjured or misremembered writing [could] override actual historical events." Id. This means that when a party proffers an after-the-fact "note or memorandum" that it says

reduces to writing an earlier oral transfer, it has to produce independent, extrinsic proof of "that crucial historical fact." Id. Plaintiffs have no proof of any oral assignment between Fisher Enterprises and the Fisher Trust occurring as of October 31, 2017.

All of this is immaterial, however, as Plaintiffs do not have to provide proof. They enjoy a presumption of validity for having registered the copyright. Defendants have no evidence that would overcome this presumption. Thus, the Court will deny this portion of Defendants' motion for summary judgment.

**A.2. Defendants' Affirmative Open-Source Defense**

Plaintiffs motion for summary judgment requests that the Court rule that Defendants' asserted open source defense fails. The open-source General Public License ("GPL") provides that when a party "conveys" GPL-covered software to another party, that other party receives an automatic license from the developer of OpenCart to use, modify, or distribute the software. And "[a] valid license is an affirmative defense to copyright infringement." *Sony/ATV Publ'g, Ltd. Liab. Co. v. Marcos*, 651 F. App'x 482, 485 (6th Cir. 2016) (citing *Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 433 (1984)).

Defendants' open-source defense depends on: (1) whether the MySAS App and the CAD Download Software are "covered works" under the open-source GPL and (2) whether Fisher Enterprises "conveyed" those works to SAS as part of the Fisher-Piab Transaction. (Doc. 99, Pltfs.' MSJ, PageID 6683.) The GPL provides that a "covered work" subject to its terms includes a work "based on" the original GPL-covered "Program." (Doc. 87-6, GPL, PageID 6336.) Here, the OpenCart software is potentially a GPL-covered "Program." (Doc. 99, Pltfs.' MSJ, PageID 6703 ("Applied here, the 'Program' is OpenCart.").)

The CAD Download Software could be considered a "'covered work' subject to the GPLv3," as it is arguably "based on the OpenCart source code." (Id.) The other work, the MySAS App, is also potentially a work "based on" the GPL-covered OpenCart software. The MySAS App was arguably dependent on and could not function without access to the OpenCart Catalog Website and the OpenCart Database. (Doc. 99, Pltfs.' MSJ, PageID 6703.) Without the MySAS App being able to connect to the OpenCart Catalog Website or the OpenCart Database, an app user could not register to use the app, log in to the app, find product information, or place a product order. Therefore, arguably the app has no use unless it interfaces with the GPL-covered OpenCart software. The MySAS App was "tightly integrated" with OpenCart. (Doc. 87-3, HelfinSiegel Report, PageID 6243, ¶ 58.) Without modification, the mySAS App "cannot operate" without OpenCart. (Doc. 99, Pltfs.' MSJ, PageID 6684.) The MySAS App "module" interacted "constantly" with the OpenCart Database, "accesse[d] the [OpenCart] database extensively" in order to function and was "intricately tied to the particular structure and content of the [OpenCart] database." (Doc. 76-7, Pltfs.' Interrog. Resp., PageID 5286, 5296.)

MySAS App was sufficiently dependent on the OpenCart software that it could be considered to be "based on" that GPL-covered software. The FAQ page from the authors of the GPL states that "[l]inking a GPL covered work statically or dynamically with other modules is making a combined work based on the GPL covered work." (Doc. 87-7, GPL FAQ Part 1, PageID 6358.) In that case, "the terms and conditions of the [GPL] cover the whole combination." (Id.) The OpenCart Catalog Website and the OpenCart Database are GPL-covered works. (Doc. 99, Pltfs.' MSJ, PageID 6703 (admitting that "the SAS e-Commerce Platform" and "the SAS SQL Database" are "'covered works' subject to the GPLv3, since they were based on the OpenCart source code").) The MySAS App is a "module" that is arguably "intricately tied"

to these GPL-covered works. (Doc. 76-7, Pltfs.' Interrog. Resp., PageID 5296.) Thus, a finder of

fact could conclude that this is an example of "[l]inking a GPL covered work" (i.e., OpenCart)

"with other modules" (i.e., the MySAS App) to "mak[e] a combined work based on the GPL

covered work," the whole of which is subject to the GPL. (Doc. 87-7, GPL FAQ Part 1, PageID

6358.)

Plaintiffs contend that, rather than being combined into a "single [GPL-]covered work,"

the MySAS App and the OpenCart software represent "two separate programs" forming a mere

"aggregate." (Doc. 99, Pltfs.' MSJ, PageID 6705.) However, section 5 of the GPL distinguishes

between GPL-covered "combined" works which are subject to the GPL terms in their entirety

and "aggregate[s]" of "separate and independent works":

> A compilation of a covered work with other separate and
> independent works, which are not by their nature extensions of the
> covered work, and which are not combined with it such as to form
> a larger program, in or on a volume of a storage or distribution
> medium, is called an "aggregate" if the compilation and its
> resulting copyright are not used to limit the access or legal rights of
> the compilation's users beyond what the individual works permit.
> Inclusion of a covered work in an aggregate does not cause this
> License to apply to the other parts of the aggregate.

(Doc. 87-6, GPL, PageID 6338.) Plaintiffs suggest that the combination of the MySAS App with

the GPL-covered OpenCart Catalog Website and OpenCart Database is an "aggregate," and that

the inclusion of the GPL-covered works in this "aggregate" does not cause the GPL terms to

apply to the remaining work (i.e., the MySAS App). (Doc. 99, Pltfs.' MSJ, PageID 6704.)

However, the GPL defines the term "aggregate" to cover the limited situation where a

GPL-covered work is "compil[ed]" with other works "in or on a volume of a storage or

distribution medium." (Doc. 87-6, GPL, PageID 6338.) Thus, "[a]n 'aggregate' consists of a

number of separate programs, distributed together on the same CD-ROM or other media." (Doc.

19

87-7, FAQ Part 1, PageID 6363.) The MySAS App was not distributed as a separate program "on the same CD-ROM or other media" as the OpenCart Catalog Website or the OpenCart Database. The MySAS App was available for download from the Apple App Store and Google Play Store onto a user's smartphone. (See, e.g., Doc. 99, Pltfs.' MSJ, PageID 6684.) Once installed on the smartphone, the MySAS App communicated with the OpenCart Catalog Website and the OpenCart Database, both residing on SAS's servers, via the OpenCart API. (See, e.g., id., PageID 6705.)

The General Public License defines "aggregate," only to include compilations of GPL-covered works with "other separate and independent works" and does not cover situations where the other works are "combined with [a GPL-covered work] such as to form a larger program." (Doc. 87-6, GPL, PageID 6338.) The MySAS App is arguably not separate, let alone independent from, the OpenCart Catalog Website or the OpenCart Database. The app cannot function without access to the OpenCart software. Thus, for purposes of the GPL, a rational finder of fact could conclude that the relationship between the MySAS App with the OpenCart Catalog Website and the OpenCart Database, is not that of "aggregate[d]" works but of works "combined" so as to form a single, GPL-covered "larger program." (Doc. 87-6, GPL, PageID 6338.)

Plaintiffs suggest that, as a matter of law, the MySAS App is not closely enough related to OpenCart to be considered part of a "single [GPL-]covered program." (See, e.g., Doc. 99, Pltfs.' MSJ, PageID 6705.) Plaintiffs base their argument on a GPL FAQ dealing with the meaning of "aggregate." (Id.) The FAQ explains that, in divining the line between "two separate programs" (i.e., an "aggregate") and "one program with two parts" (i.e., a single GPL-covered work), factors to be considered include both "the mechanism of communication" and "the

semantics of the communication (what kinds of information are interchanged)." (Doc. 87-7, GPL, PageID 6363.) Plaintiffs suggest that, because their expert opines that the MySAS App, the OpenCart Catalog Website, and the OpenCart Database were not distributed in "the same executable file," were not "linked together in a shared address space," and used "sockets" to communicate, that must mean that the MySAS App is a program "separate" from the OpenCart software. (Doc. 99, Pltfs.' MSJ, PageID 6705-06.)

Assuming arguendo that the criteria listed in this FAQ apply to non-"aggregate[d]" compilations (that is, compilations that are not actually "distributed together on the same CD-ROM or other media"), Defendants' expert Joshua Helfin Siegel explains that both the "mechanism" and "semantics" of how the MySAS App communicated with the OpenCart Catalog Website and the OpenCart Database lead to the conclusion that these programs form a single, combined "covered work" for purposes of the GPL. (Doc. 87, HelfinSiegel Tr., PageID 6032-34, 157:1-159:12, 162:1-163:12 (explaining, for example, that the URLs for the OpenCart Catalog Website are "hard-coded" into the source code for the MySAS App, and that these programs do, in fact, use "sockets" to communicate).)

A reasonable finder of fact could conclude that the CAD Download Software cannot function without interacting with the OpenCart catalogue and database and that it is "based on" those programs. Thus, if Fisher Enterprises "conveyed" those works to SAS as part of the Fisher-Piab Transaction, the GPL would provide a defense to copyright claims. The GPL defines this as well.

Fisher Enterprises "conveyed" the MySAS App and the CAD Download Software to SAS when, as part of the Fisher-Piab Transaction, it licensed both of those works back to SAS in the License Agreement. Once Fisher Enterprises did that, SAS arguably had an "automatic[]"

license under Section 10 of the GPL to modify the MySAS App and the CAD Download Software and to distribute these works to others (including, for example, the Piab Defendants) if that is what it wished to do.

If the GPL covers MySAS and OpenCart, Section 10 of the GPL prevented Fisher Enterprises from attempting to enforce "any further restrictions" against SAS or any other parties who received copies of the software downstream from SAS. For this reason, even if Fisher Enterprises could prove that SAS made the MySAS App and/or the CAD Download Software available to the Piab Defendants  or otherwise violated the restrictions recited in the License Agreement, Fisher Enterprises' copyright infringement claims against SAS and the Piab Defendants would still fail.

Plaintiffs do not explain why Fisher Enterprises' licensing of the MySAS App and the CAD Download Software back to SAS in the License Agreement did not constitute a "conveyance" of those works to SAS within the meaning of the GPL. Plaintiffs suggest that these software works have never been "conveyed" to the public, (Doc. 99, Pltfs.' MSJ, PageID 6707), but the question is whether Fisher Enterprises has "conveyed" these works to SAS. Plaintiffs also suggest that a "conveyance" requires "some sort of physical or digital transfer of a copy of the work," and that, following the Piab-Fisher Transaction, SAS never provided physical copies of the source code for the MySAS App and the CAD Download Software to Mr. Fisher. (Id.) But a reasonable finder of fact could determine that Fisher conveyed the software to SAS by the act of licensing it to SAS in the License Agreement.

The GPL defines "convey" to mean "any kind of propagation that enables other parties to make or receive copies." (Doc. 87-6, GPL, PageID 6337.) Here, SAS had possession of the source code for the MySAS App and the CAD Download Software prior to the Fisher-Piab

Transaction. When that transaction closed, Fisher made no effort to remove physical copies of those programs from SAS's servers; to the contrary, Plaintiffs admit that "the source code remained on servers at SAS's Xenia location after the 2017 [Fisher-Piab] transaction." (Doc. 99, Pltfs.' MSJ, PageID 6707.)

Fisher, through Fisher Enterprises, also arguably licensed the software back to SAS in the License Agreement. Mr. Fisher's decision to let SAS maintain physical possession of the source code and use the software arguably resulted in SAS "receiv[ing]" a copy of the software and being able to "make copies" of it. While the License Agreement purported to restrict SAS from "[d]istribut[ing]" copies of the source code to others, it did not keep SAS from making copies of the source code for internal use. (Doc. 98-2, License Agrmt., PageID 6630.) If Fisher Enterprises "conveyed" the MySAS App and the CAD Download Software to SAS, SAS arguably "automatically receive[d] a license from the original licensors [i.e., the developer of OpenCart], to run, modify and propagate" those works. (Doc. 87-6, GPL, PageID 6341.) This would mean that SAS had the right to, for example, distribute the source code to the Piab Defendants, if that is what it chose to do, irrespective of any restrictions that Fisher Enterprises purported to impose in the License Agreement.

Plaintiffs suggest that the "entity transaction" provision in Section 10 of the GPL means that no "conveyance" occurred here. (Doc. 99, Pltfs.' MSJ, PageID 6707.) The provision reads:

> An "entity transaction" is a transaction transferring control of an organization, or substantially all assets of one, or subdividing an organization, or merging organizations. If propagation of a covered work results from an entity transaction, each party to that transaction who receives a copy of the work also receives whatever licenses to the work the party's predecessor in interest had or could give under the previous paragraph, plus a right to possession of the Corresponding Source of the work from the predecessor in interest, if the predecessor has it or can get it with reasonable efforts.

23

(Doc. 87-6, GPL, PageID 6341.)

Plaintiffs argue that the Piab-Fisher Transaction, including the main purchase agreement, the IPAA, and the License Agreement, qualifies as an "entity transaction." (Doc. 99, Pltfs.' MSJ, PageID 6708.) As a result of this "entity transaction," SAS retained a copy of the source code for what Plaintiffs call the "Software Works," which include the MySAS App and the CAD Download Software. (Id., PageID 6678, 6697.) But this was purportedly licensed to Defendants. "As a holder of a copy of the work[s] following an 'entity transaction,' SAS received 'whatever licenses to the work the party's predecessor in interest had or could give under the previous paragraph.'" (Id., PageID 6697.)

The "entity transaction" provision of the GPL states that, in addition to the right of "possession," a holder of a GPL-covered work following an "entity transaction" receives all "licenses" listed in the "previous paragraph"—and that "previous paragraph" is the paragraph in Section 10 that grants all recipients of a GPL-covered work an explicit "license from the original licensors, to run, modify and propagate that work." (Doc. 87-6, GPL, PageID 6341.) "As a holder of a copy of the work[s] following an 'entity transaction,'" SAS arguably received the right to freely modify or distribute the source code for the MySAS App and the CAD Download Software.

"Conveying" a GPL-covered work is defined in the GPL as simply "propagating" it a fashion that "enables other parties to make or receive copies." (Doc. 87-6, GPL, PageID 6337.) The "entity transaction" provision refers to "propagation of a covered work" during a transaction that results in a party to the transaction "receiv[ing] a copy of the work," which would constitute a "conveyance." (Doc. 87-6, GPL, PageID 6341.)

24

Thus, following the Fisher-Piab transaction, a jury could reasonably conclude that SAS had a license under the GPL to modify and distribute to others (including to the Piab Defendants) both the MySAS App and the CAD Download Software, without Fisher Enterprises' permission. The Court therefore will deny this portion of Plaintiffs' motion for summary judgment.

### A.3  Copyright Infringement Damages

Defendants request that, should the Court not award summary judgment to them on Plaintiffs' claims of copyright infringement, the Court award a limitation of damages on that claim. The Copyright Act sets up a two-step process for calculating the "profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). The Copyright Act gives the plaintiff the initial burden of proving "the infringer's gross revenue." Id. This requires the plaintiff to offer "non-speculative evidence" that the revenues used for calculating profit damages have a "reasonable relationship to the infringing activity." *Balsley v. LFP, Inc*., 691 F.3d 747, 769-70 (6th Cir. 2012). More than some "conceivable connection" is needed. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522-23 (4th Cir. 2003). Only after the plaintiff identifies the appropriate revenue base does the burden shift to the defendant to "sort[] out which of the[] 'reasonably related' gross revenues are actually profits (i.e., net[] out expenses), and of those profits, which are actually attributable to the infringement." *Navarro v. P&G*, 501 F. Supp. 3d 482, 497 (S.D. Ohio 2020).

While "reasonable relationship" is a flexible test, it cannot be stretched "beyond its breaking point." *Navarro v. P&G*, 515 F. Supp. 3d 718, 765 (S.D. Ohio 2021) (products advertised without infringing photograph next to products that did feature infringing photos, an "indirect relation" too "attenuated" to make this category of products be "reasonably related" to the infringement); *ECIMOS, LLC v. Carrier, Corp*., 971 F.3d 616, 623 (6th Cir. 2020)

(copyrighted software used in all 103 quality control stations at a manufacturing facility allowed plaintiff to present revenues derived from products manufactured at that specific facility rather than the defendant's total revenues). Id. A plaintiff cannot meet its statutory burden under § 504(b) by simply offering proof of the defendant's total revenues. See *On Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001). Thus, Fisher Enterprises must identify revenues "reasonably related" to the alleged infringing activity: (1) the use of the piPARTS App or (2) the use of the CAD Download Software in the OpenCart piPARTS.shop Website.

The Third Amended Complaint claims that all of Piab AB's revenues from January 2020 and May 2020, $77 million, are subject to profit disgorgement. (Id.) However, Plaintiffs' expert admits that she has no evidence of Piab AB using either the piPARTS App or the CAD Download Software. Fisher Enterprises has no evidence that any of Piab AB's revenues are "reasonably related" to the allegedly infringing activity. No Piab AB products were sold or offered for sale on the piPARTS App or the OpenCart piPARTS.shop Website. (Ex. A, Roundtree Decl., ¶ 13.) Piab USA's Swedish parent never made any use of or derived any revenues from these sales channels. Plaintiffs' damages expert, Ms. Saitz, admits that she "do[es] not know to what extent Piab AB has utilized the infringed copyrights." (Doc. 79-2, Saitz Rebuttal, PageID 5593, ¶ 71.)

From January 2020 to May 2020, the OpenCart Database, which tracked every "OpenCart" order whether it was submitted through the piPARTS App or the OpenCart piPARTS.shop Website, registered only $80,538 in combined sales ("OpenCart Sales"). (Doc. 79-6, Hock Report, PageID 5651.) These sales by the SAS portion of Piab USA's business is the only part of its overall revenues that could be "reasonably related" to the alleged infringement.

26

Saitz asserts that Non-OpenCart Sales are relevant because the "e-commerce platform" facilitated some sales that were never actually "recorded on the platform itself." (Doc. 79-1, Saitz Report, PageID 5534-36, ¶ 36.) She postulates some customers may have used the "ecommerce platform" to find the components they were looking for before sending their purchase orders "offline" to internal purchasing departments in lieu of checking out online. (Id.) By "ecommerce platform," Saitz means the OpenCart piPARTS.shop Website. (See id., PageID 5527-33, ¶ 32 (distinguishing between the "piParts.shop e-commerce platform" and the "piParts App").)

Fisher Enterprises also accuses the piPARTS App of copyright infringement. However, Saitz does not present specific evidence that any external customers used the app to facilitate "offline" (Non-OpenCart) purchases. (See Doc. 79-1, Saitz Report, PageID 5527-33, ¶ 32.) On the contrary, undisputed testimony establishes that the app was mostly used by internal SAS/Piab USA sales personnel. (See supra at 3; see also Doc. 48, 08/04/22 Roundtree Tr., PageID 1085-86, 129:22-130:18; Doc. 64, McGovern Tr., PageID 2172, 106:6-17.)

However, Piab USA's Controller admitted Piab had no way to track total sales that were made in whole or in part due to the e-commerce system but not ordered through the shopping cart, and admitted the sales force reported negative impact from the loss of the Software. (Dep. Tr. Michael Brotz, 12/19/2022, Doc. #74 ["Brotz Dep."], 211:3-264:10, PageID #4222-35; id., Ex. 233, PageID #4397-99; id., 2018:8-16; id., Ex. 234, PageID #4400-01; id., 211:3-10, PageID #4222). Crucially, Mike Brotz also admitted the loss of sales in that business segment alone could be as high as $250,000 to $500,000. (Id.) This would suffice to potentially convince a reasonable trier of fact of the existence of potential damages exceeding $80,538.

Because Defendants can show a reasonable relationship of damages exceeding $80,538 of sales potentially reasonably related to the alleged infringement, this portion of Defendants' motion for summary judgment will also be denied.

## B. Trade Secret Misappropriation

The elements of trade secret misappropriation are largely the same under Ohio and federal law: (1) the existence of a trade secret, (2) the acquisition of a trade secret as a result of a confidential relationship, and (3) the unauthorized use of a trade secret. *Aday v. Westfield Ins. Co.*, 486 F. Supp. 3d 1153, 1160, 1166 (S.D. Ohio 2020). The plaintiff has to define its trade secrets with "reasonable particularity." *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc*., 53 F.4th 368, 381 (6th Cir. 2022). "If a plaintiff effectively assert[s] that all information in or about its [product] is a trade secret, then it brings a case both too vague and too inclusive, and does not allow a jury to separate the trade secrets from the other information that goes into any product in the field." *Id*. The plaintiff's failure to specifically identify its alleged trade secrets is grounds for summary judgment. *Idx Sys. Corp. v. Epic Sys. Corp*., 285 F.3d 581, 583-84 (7th Cir. 2002); *Big Vision Private, Ltd. v. E.I. Dupont De Nemours & Co*., 1 F. Supp. 3d 224, 266 (S.D.N.Y. 2014).

Based on their unverified interrogatory responses and their expert's "assumption[s]" (see supra at 6-7), Plaintiffs' alleged trade secrets consist of: (1) the iOS MySAS App; (2) the Android MySAS App; (3) the OpenCart API; (4) the OpenCart Extensions, including CAD Download Software; (5) the OpenCart Database; and (6) the combination of items 1 through 5.

Plaintiffs expert, Monty G. Myers, attaches to his report a two-volume appendix of more than 5,000 pages, where he lists every computer file in the six "trade secret" items and then reproduces every line of code contained within those files. (Doc. 82-3, Ex. C, Myers Vol. I; Ex.

D, Myers Vol II.) In doing so, he and Plaintiffs take the position that "every line of the [referenced] source code, either alone or in combination[,] constitutes a trade secret." *Paysys Int'l, Inc. v. Atos Se*, No. 14-cv-10105, 2016 U.S. Dist. LEXIS 169098, at *23 (S.D.N.Y. Dec. 5, 2016).

A combination trade secret can be made in part or in whole of public domain information if it is combined in a unique way. See *Mike's Train House, Inc. v. Lionel*, LLC, 472 F.3d 398, 410-11 (6th Cir. 2006). The MySAS App (Fisher Enterprises' first and second "trade secrets," respectively) includes barcode-scanning software licensed from Scandit, a third-party company. (Doc. 48, 08/04/22 Roundtree Tr., PageID 1084, 123:22-124:3, 124:4-125:5.) Roundtree wrote the OpenCart API (the third "trade secret") using a "boilerplate" API from a public website, from which he recycled "at least 50 percent of the code." (Id., PageID 1121, 271:19-272:3.) The OpenCart Extensions and the OpenCart Database (the fourth and fifth "trade secrets") are modifications of files from the open-source OpenCart software that Roundtree used to build the OpenCart Catalog Website. (Id.; Ex. E, HelfinSiegel Report, ¶¶ 55, 125; see also Ex. F, HelfinSiegel Decl.)

This is not to say, however, that the GPL cannot provide a defense. "Without expert testimony separating source code that derives value from being secret from opensource and third-party source code, which does not," Plaintiffs cannot prove any trade secret exists. *Dropzonems, LLC v. Cockayne*, No. 3:16-cv-02348-YY, 2019 U.S. Dist. LEXIS 225681, at *29 (D. Or. Sep. 12, 2019). Indeed, allowing Plaintiffs to avoid the GPL by labelling what they have done with it a trade secret would obviate the GPL project. Because it is not beyond cavil that the Open Source Defense will apply and because resolution of this issue otherwise depends upon

evaluating the contradicting opinions of expert witnesses, Defendants will be denied summary judgment on the trade secrets claims.

### C. Breach of the IPAA.

SAS also moves for summary judgment on Plaintiff's Count VII, Breach of the Intellectual Property Assignment, asserting that, even if Plaintiff can show breach, Plaintiff cannot prove damages. In addition to conveying to the Fisher Trust the "Transferred IP" listed in its Exhibit A, the IPAA also conveyed "NileMerry Assets" listed in its Exhibit C. (Doc. 56, TAC, PageID 2090, ¶ 40.) Before the Fisher-Piab Transaction, SAS had used a separate e-commerce website to sell "Nile"- and "Merry"-branded industrial tools sourced from Japan. (Id., PageID 2090, ¶ 40.) In the IPAA, SAS gave ownership of this website and related IP (collectively, the "NileMerry Assets" listed in Exhibit C to the IPAA) to the Fisher Trust so that Trent Fisher could use them to start his own NileMerry business. (Id., PageID 2090, 2092, ¶¶ 40, 48.)

Plaintiffs claim SAS breached the IPAA by (1) not timely transferring some of these NileMerry Assets to the Trust and (2) continuing to use unspecified NileMerry "texts, drawings, graphics, product information and certain customer information." (Doc. 76-7, Pltfs.' Interrog. Resp., PageID 5333-35.) They claim $485,000 in damages: (1) $360,000 in "lost profits" they "assum[e]" Mr. Fisher's NileMerry business incurred due to SAS's alleged failure to timely deliver the NileMerry Assets and (2) $125,000 for the "value" of those unspecified assets that SAS allegedly continued using without permission. (Id.) These figures are supported by Trent Fisher's testimony based on his history and knowledge of that product line.

The general test in the state of Ohio for the recovery of lost profits requires "the profits are not remote and speculative and may be shown with reasonable certainty." *Charles R. Combs*

*Trucking, Inc. v. Internatl. Harvester Co.*, 466 N.E.2d 883, at paragraph two of the syllabus (Ohio 1984). Indeed "[i]n order for a plaintiff to recover lost profits in a breach of contract action, the amounts of lost profits, as well as their existence, must be demonstrated with reasonable certainty. * * * " *Gahanna v. Eastgate Properties, Inc.*, 521 N.E.2d 814, syllabus, (Ohio 1988).

While Plaintiffs assert $485,000 in damages in their unverified interrogatory responses, Plaintiffs have produced no evidence that "would allow a jury to reasonably base an award upon evidence regarding the amount of damages," summary judgment is appropriate. *Network Health Servs. v. Georgetown Cmty.*, LLC, 169 F. App'x 455, 459 (6th Cir. 2006) (Rose, J., sitting by designation and applying Kentucky law).

Plaintiffs start with a $360,000 in "lost profits," based on Plaintiffs' "assumption" that Mr. Fisher's NileMerry business would have tripled its revenues if SAS had timely delivered the missing NileMerry Assets. (Doc. 76-7, Pltfs.' Interrog. Resp., PageID 5334.) The $125,000 in compensation for the "value" of unidentified NileMerry Assets that SAS allegedly continued to use after the signing of the IPAA (Doc. 76-7, Pltfs.' Interrog. Resp., PageID 5334) is derived from the value of this "information" for "five years" was at least "$25,000 per year" is based on an "estimate o[f] the time, money and effort SAS [had] invested in" creating its NileMerry website and "the value this information contribute[d] to selling NileMerry products through the website." (Id.)

Plaintiffs have not "present[ed] facts from which the loss may be reasonably calculated." *Cincinnati Fluid Power, Inc. v. Rexnord, Inc.*, 797 F.2d 1386, 1393 (6th Cir. 1986) (internal citation omitted). The amounts postulated are speculative and not sufficient to support a damages award. *Agf*, 51 Ohio St. 3d at 183, 555 N.E.2d at 639-40. Plaintiffs have not offered "economic

and financial data, market surveys and analyses, business records of similar enterprises, and the like"— or "expert testimony"—to support their position. *Agf, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 639-40 (Ohio 1990). Plaintiffs do not have evidence that would support an award of damages on their breach of the IPAA.

The Court notes that Plaintiffs seek specific performance. However, the remedy of specific performance is not available if the contract has been terminated. *Cincinnati Indus. Mach. v. Vmi Holland Bv*, No. 1:09-CV-604, 2012 U.S. Dist. LEXIS 206883, at *39 (S.D. Ohio Aug. 15, 2012). Fisher Enterprises unilaterally terminated the License Agreement in June 2020. (Doc. 99-3, Termination Ltr., PageID 6718.) Summary judgment will be entered in favor of Defendants on Plaintiffs' claim for breach of the IPAA.

### D.    Breach-of-License Claim

Defendants seeks summary judgment on Count IX, Plaintiffs' claim that SAS breached the License Agreement. Plaintiffs' expert, Juli Saitz, found that Plaintiffs would be entitled to monetary remedies by law in the total amount of $3.9 million, calculated "in the form of an avoided license fee." (Saitz Report, ¶¶43, 91 PageID 5538, 5552; Saitz Rebuttal Report, ¶¶72-73, PageID 5593). At the same time, the Open-Source GPL is available as a potential defense.

Fisher Enterprises claims that, by "altering or modifying" the MySAS App to create the piPARTS App, SAS breached Section 2 of the License Agreement, which purports to prohibit SAS from "modify[ing]" or "[d]istribut[ing]" the Licensed IP. (Doc. 99, Pltfs.' MSJ, PageID 6697-98.) However, this claim may fail for the same reasons Fisher Enterprises' copyright claims may fail. Specifically, to the extent the Licensed IP includes the GPL covered MySAS App, the GPL explicitly prohibits Fisher Enterprises from imposing "any further restrictions" on SAS's ability to use, modify, or distribute any of that software. Fisher Enterprises also contends

that SAS breached Section 10 of the License Agreement, which purports to restrict SAS's

disclosure of "Confidential Information," by disclosing certain supposedly "confidential"

information to the Piab Defendants. (Doc. 99, Pltfs.' MSJ, PageID 6698-99.) However, inasmuch

as this "confidential" information includes information relating to the MySAS App and the CAD

Download Software, Fisher Enterprises' contention could fail if they are found to be based on

OpenCart and are subject to the GPL. Because damages, if there are any, hinge upon conflicting

testimony, this portion of Defendants' motion will be denied.

### E. Wrongful Removal of Copyright Management Information

Count XI alleges violation of the Digital Millennium Copyright Act. The Digital

Millennium Copyright Act prohibits "intentionally remov[ing] or alter[ing] any copyright

management information" without the copyright owner's consent. 17 U.S.C. § 1202(b).

Copyright management information is information "conveyed in connection" with a copyrighted

work and includes the work's author, title, and copyright owner. Id. § 1202(c). Only a person

"injured" by a violation of § 1202(b) can sue "for such violation." Id. § 1203(a).

Plaintiffs assert Defendants violated § 1202(b) by changing the copyright notice in the

source code for the piPARTS App from "SAS Automation" to "Piab." (Doc. 56, TAC, PageID

2121, ¶¶ 168-171.) "That § 1203(c) allows for statutory damages in lieu of actual damages does

not change the first requirement that [the plaintiff] be injured before it can bring a claim." *Alan

Ross Mach. Corp. v. Machinio Corp*., No. 17-cv-3569, 2019 U.S. Dist. LEXIS 47484, at *13

(N.D. Ill. Mar. 22, 2019). Court decisions interpreting the statute make clear "injury" refers to

standing. *Furnituredealer.net, Inc. v. Amazon.com, Inc*., No. 18-cv-232, 2022 U.S. Dist. LEXIS

54509, *70-71 (D. Minn. Mar. 25, 2022) (analyzing "injury" as a constitutional standing issue,

and finding it is "not a high bar").

Fisher Enterprises asserts it sustained sufficient injury because it lost the ability to control its copyrighted works and a license fee it intended to earn. While Defendants seek to limit the number of DMCA violations to one, Myers identified several places in the source code for the piParts app where Defendants inserted altered CMI. (See Myers Report, ¶¶93, 96 PageID #4937-39; id. ¶¶103-104, PageID #4942-43; id., ¶¶271-273, PageID #5042-43; id., Exs. AA.6-1 and AA.6-2 (filed manually with the Court, see Doc. #91)). Myers also identified a screen shot of the "information" page of the piParts App displaying a falsified copyright notice identifying the owner as "Piab Group." (Id., Exhibit AA.5 (filed manually)). Thus, should Defendants be found to have violated Plaintiffs' copyright without a defense, Plaintiffs will be allowed to prove damages.

### F. Plaintiffs' Motion For Summary Judgment

Plaintiffs move for summary judgment on Defendants' affirmative defense based on the open-source GPL. (Doc. 99, Pltfs.' MSJ, PageID 6702.) The open-source GPL potentially provides SAS with a complete defense to Fisher Enterprises' breach-of-license claim. If Fisher Enterprises "conveyed" GPL-covered software to SAS as part of the Fisher-Piab Transaction, it could no longer impose any restrictions on SAS's use, modification, or further distribution of that software. Thus, Plaintiffs' claims that SAS and the Piab Defendants misappropriated Plaintiffs' trade secrets would fail.

What remains is Plaintiffs' motion for summary judgment on its claim for declaratory judgment as to whether it wrongfully terminated the license agreement.

The License Agreement permitted SAS to unilaterally terminate the agreement only after an "Event of Default" by SAS. (Doc. 98-2, License Agrmt., PageID 6638.) Per Section 9(b) of the agreement, an "Event of Default" occurs only if:

> SAS has materially breached its obligations under this Agreement
> and fails to cure such breach within thirty (30) days of notice from
> Fisher Enterprises, or if such breach is of a nature that it cannot be
> cured within thirty (30) days, such longer period as may be
> reasonably necessary to cure such breach, provided SAS
> commences curative action within said thirty (30) day period and
> thereafter prosecutes such action to completion continuously and
> diligently within a reasonable period of time.

(Id.)

Plaintiffs admit that SAS took down the piPARTS App from the Apple App Store within 30 days of receiving their April 21, 2020, demand letter. (Doc. 99, Pltfs.' MSJ, PageID 6701.) Plaintiffs claim that this was "insufficient," because SAS had "shared proprietary information including copyrighted source code and trade secret information with Piab." (Id., PageID 6701-02.) This would justify Fisher Enterprises' termination of the License Agreement if the Open Source Defense fails.

Although Plaintiffs' April 21, 2020, letter to SAS had demanded that SAS "recover from any unidentified parties" copies of the MySAS App and the allegedly infringing piPARTS App (Doc. 50-11, Fisher Demand Ltr., PageID 2007), SAS explained in its response that this software had only ever been used in connection with SAS's business. (Doc. 98-1, Ex. 1, SAS Reply, p. 2.) And SAS invited Plaintiffs to try to resolve "any remaining differences with minimum disruptions to either party's business" and to discuss "any open issues" that remained. (Id., p. 5.) Fisher Enterprises terminated the license (Doc. 99-3, Fisher Termination Ltr.) and filed this lawsuit.

A jury could reasonably conclude that SAS had at the very least, "commence[d] curative action" within 30 days, if not cured any purported breach completely. This would mean that no "Event of Default" had occurred, that Fisher Enterprises had no basis to terminate the License

Agreement under Section 9(b), and that its termination of the agreement was in breach of that provision.  Thus, Plaintiffs' motion for summary judgment will be denied in its entirety.

### IV.    Conclusion

Because Plaintiffs enjoy a presumption of validity for having registered the copyright, and because Defendants can show a reasonable relationship of damages exceeding $80,538 of sales potentially reasonably related to the alleged infringement the Court **DENIES** Defendants' motion for summary judgment on Counts 1-4 of the Third Amended Complaint. Because Plaintiffs' expert has identified trade secrets that could possibly have been violated, the Court **DENIES** Defendants' motion for summary judgment on Counts 5-6 of the Third Amended Complaint. Because, even if Plaintiffs can show breach of the IPAA, Plaintiffs' estimates of losses from any breach are speculative, the Court **GRANTS** summary judgment in favor of Defendants on Count 7 of the Third Amended Complaint. Because there is conflicting testimony regarding damages stemming from Plaintiffs' asserted breach of license claim, the Court **DENIES** Defendants' motion for summary judgment on Count 9 of the Third Amended Complaint. Because Plaintiffs can potentially show multiple violations of a right to control copyright management information, should Defendants be found to have violated Plaintiffs' copyright without a defense, the Court **DENIES** Defendants' motion for summary judgment on Count 11 of the Third Amended Complaint. The Court thus **GRANTS-IN-PART** and **DENIES IN PART** Motion for Summary Judgment by Defendants Piab AB, Piab USA, Inc., SAS Automation, LLC. Doc. 81.

Because a jury could reasonably conclude that SAS had a license under the GPL to modify and distribute to others, including to the Piab Defendants, both the MySAS App and the CAD Download Software, without Fisher Enterprises' permission, and because a jury could

reasonably conclude that SAS had "commence[d] curative action" within 30 days, the Court **DENIES** Plaintiffs' Motion for Summary Judgment as to Liability on Counts Nine and Ten of the Second Amended Complaint[5] and Count One of the Counterclaim. Doc. 101.

The case remains set for trial on January 8, 2024. Doc. 122.

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, August 3, 2023.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

---

[5] Plaintiffs' motion contains in its title "Second Amended Complaint." While Plaintiffs have now filed a Third Amended Complaint, doc. 98, by agreement of the parties, the motion now addresses the Third Amended Complaint. Counts Nine and Ten of the second and third amended complaints are the same.